<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUSAN MAHANOR,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>BERKLEY LIFE SCIENCES,<br><br>　　　　　　Defendant. | Civ. No. 21-18981 (GC)<br><br>**MEMORANDUM OPINION** |

<u>CASTNER, District Judge</u>

     **THIS MATTER** comes before the Court on the Motion to Dismiss the Amended Complaint, filed by Defendant Berkley Life Sciences on November 23, 2021. (ECF No. 9.) The Court has decided the Motion based on the written submissions of the parties and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, the Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

**I.     <u>BACKGROUND</u>**

    A.     *Alleged Facts*

    Plaintiff Susan Mahanor ("Plaintiff") is a resident of Media, Pennsylvania.[1] (Am. Compl. ¶ 10, ECF No. 8.) Defendant Berkley Life Sciences ("Berkley") is a division of Berkley Insurance Company, which is a business entity incorporated in Delaware with its principal place of business

---

[1] In analyzing the sufficiency of a complaint attacked by a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

in Connecticut. (*Id.* ¶ 11; Def.'s Br. 2 n.1, ECF No. 9-1; Not. of Removal ¶ 5, ECF No. 1.) Plaintiff was an employee of Berkley from around April 2015 through around September 2019. (Am. Compl. ¶¶ 34, 79, 80.)

Prior to working for Berkley, Plaintiff worked for ACE Insurance in the "second highest ranking position in the Mid-Atlantic region," where she oversaw "fifteen employees and a $120 Million book of business." (*Id.* ¶¶ 17–18.) At ACE Insurance, Plaintiff worked in a "$2 Billion division and the largest at ACE." (*Id.* ¶ 19.)

Around January or February 2015, Berkley Field Officer Emily Urban ("Urban") contacted Plaintiff regarding a position as "Eastern Territory Manager" with Berkley. (*Id.* ¶ 20.) Urban "convinced" Plaintiff "to meet with her, so they could 'get to know each other,' and cited the lack of women in senior management positions in the insurance industry." (*Id.* ¶ 21.)

Thereafter, Urban, Plaintiff, and Berkley President Jill Wadlund ("Wadlund") met for lunch in Philadelphia. (*Id.* ¶¶ 22–23.) Plaintiff informed Urban and Wadlund that "she considered the Eastern Territory Manager role" a "lateral move," and she would "not consider leaving her then-current role for such a lateral move." (*Id.* ¶ 23.) She also "expressed concern about the long commute" to Ewing, New Jersey. (*Id.* ¶ 24.) Plaintiff also "made clear what her compensation was at ACE, and that leaving ACE would result in a significant forfeiture of unvested stock options and awards." (*Id.* ¶ 25.)

In response to these concerns, Wadlund "promised to expand the Territory Manager role, groom [Plaintiff] to take over as Global Field Officer and promised [Plaintiff] she would take over as Global Field Officer." (*Id.* ¶ 26.) Specifically, Wadlund "advised [Plaintiff] that [Wadlund] planned to retire from her position as President within the next three to five years," and that Urban would fill the President role, "leaving the Global Field officer position vacant for [Plaintiff.]" (*Id.*

¶ 31.) Wadlund "promised" that Plaintiff would be promoted to the Global Field Officer Position. (*Id.*)

Berkley "committed to [Plaintiff] that any commuting to Ewing would only be on a temporary basis." (*Id.* ¶ 28.) Plaintiff was also told that Berkley would utilize its space in the "Philadelphia area in the near future," and was "promised [] that she would be permitted to split her time between Philadelphia and working from home." (*Id.* ¶ 32.) Wadlund advised Plaintiff that "she intended to place all Eastern Territory employees in Philadelphia, separate from the Ewing-based employees." (*Id.* ¶ 33.)

According to Plaintiff, after these conversations, both Plaintiff and Berkley "understood that [Plaintiff] was being promised employment of at least six years." (*Id.* ¶ 29.) Plaintiff also alleges that, "[b]ased on the commitments and promises made by Berkley, [she] left a stable, lucrative position with ACE and accepted the Eastern Territory Manager position with Berkley." (*Id.* ¶ 30.) She did so "with the understanding that she would be quickly promoted to positions with increased compensation and responsibility, that she would be promoted into the Global Field Officer role, and that her commute to Ewing would be temporary." (*Id.*)

According to Berkley, after the in-person discussion between Plaintiff, Wadlund, and Urban, Plaintiff submitted an "application for employment" dated March 6, 2015. (Def.'s Br. at 8.) Berkley attached it to the Motion to Dismiss. (*See* Appl., Def.'s Ex. 1, ECF No. 9-3.) The employment application includes a statement where Plaintiff acknowledged that "[her] employment and compensation are at-will and therefore can be terminated, with or without cause, at any time without prior notice, at [her] option or Berkley Life Sciences['] option." (Appl. 3; Def.'s Br. 8.) It also states, "[t]his at-will employment relationship may not be modified by any oral or implied agreement, is intended to apply to the entire employment relationship between me

and Berkley [] and supersedes any prior employment agreement between me and Berkley []."
(Appl. 3; Def.'s Br. 8.)

Berkley also attached to its Motion to Dismiss an "offer letter" dated March 12, 2015,
which Plaintiff signed and dated March 13, 2015. (Def.'s Br. 8; Offer Letter 2–3, Def.'s Ex. 2,
ECF No. 9-4.)[2] The offer letter states, "Our offer should not be construed as, and is not a guarantee
of[,] employment for any specific duration. As any employee of the Company, you will be an at-
will employee." (Def.'s Br. 8–9; Offer Letter 1.)

Berkley also attached an employee handbook, which states that "when employment
terminates, the employee will not be paid for any accrued, unused vacation time, except where
mandated by state law." (Employee Handbook 19, Def.'s Ex. 3, ECF No. 9-5.)

In April 2015, Plaintiff began working at Berkley. (Am. Compl. ¶ 34.) Her initial
compensation package at Berkley was lower than what she made at ACE. (*Id.* ¶ 35.)

Plaintiff "quickly distinguished herself as the top field manager under [] Urban," who
informed Plaintiff "on numerous occasions how happy she was that [Plaintiff] joined Berkley and
that she was doing an excellent job." (*Id.* ¶¶ 36–37.)

Around October 2015, after Berkley "secured space for [Plaintiff]" in Philadelphia,
Plaintiff was told that "she would only be required to be physically present in the Ewing, New
Jersey office one day per week," and that she could work two days from home, and two days from
Philadelphia. (*Id.* ¶ 48.)

Plaintiff "continued to excel in her position," received strong feedback from Urban and in
her performance reviews, and received bonuses and salary increases during her employment at

---

[2] The pages to which the Court cites are the CM/ECF page numbers.

Berkley. (*Id.* ¶¶ 49–51.) Plaintiff also took on managing the western territory after her counterpart in the western territory resigned. (*Id.* ¶ 52.)

After three years of working at Berkley, Wadlund announced her retirement, and that Urban would take over the position of President. (*Id.* ¶ 53.) Urban also told Plaintiff that she planned to eliminate the position of Global Field Officer, so Plaintiff would remain as a "Territory Manager." (*Id.* ¶ 55.) Urban made Plaintiff a member of her "executive team of her six top leaders," where Plaintiff would help "mak[e] key strategic decisions for Berkley." (*Id.* ¶¶ 59–61.) Plaintiff received positive feedback about her assistance to Urban from the Executive Vice President. (*See id.* ¶ 68.)

In "late 2018," Urban informed Plaintiff that she "had to report to the Ewing, New Jersey office three days per week," which "resulted in significant hardship to [Plaintiff]," who now had to commute approximately 110 miles per day on the days she commuted there and work late to make up for the commute time. (*Id.* ¶¶ 70–72.) Plaintiff did so "without complaint." (*Id.* ¶ 73.)

In January 2019, Berkley laid off "a dozen employees," mostly in administrative roles. (*Id.* ¶ 74.) Urban indicated her intention to offer the laid-off employees the "maximum amount of severance," despite the fact that the company "faced some financial issues." (*Id.* ¶ 75.)

According to Plaintiff, the "company's failings were linked to [] Urban's shortcomings as President," but Urban attempted to "shift blame from herself to [Plaintiff] for company issues." (*Id.* ¶¶ 76–77.) After Urban began as President, "several key individuals left the organization voluntarily," and one cited Urban's "poor leadership" as the main reason for leaving. (*Id.* ¶ 78.)

On September 10, 2019, Urban and Human Resources Manager Claire Pollard called Plaintiff into a meeting, where Plaintiff "was abruptly informed that her position was being eliminated and that she was being terminated, effective immediately." (*Id.* ¶ 79–80.) Urban

informed Plaintiff that her termination was not performance-based and that she would receive eight weeks of severance pay, the minimum amount that Berkley offered. (*Id.* ¶ 81–82.)

As of the date of her termination, Plaintiff alleges that she had "accrued leave time," and was entitled to an "annual bonus as part of her compensation with Berkley." (*Id.* ¶¶ 86–87.) Plaintiff was also disappointed in the minimum amount of severance pay, particularly in light of the fact that Berkley gave the administrative employees the maximum amount of severance. (*Id.* ¶ 85.) According to Plaintiff, since the termination, Urban "made several comments" to Plaintiff, "making clear her intent" was to "terminate" Plaintiff, not lay her off. (*Id.* ¶ 88.)

Plaintiff alleges that, "as a result of the actions she took for the benefit of Berkley and in reliance on Berkley's representations regarding employment," she suffered "significant financial and other damages, including anxiety, emotional distress, and loss of self-esteem." (*Id.* ¶ 89.) Additionally, the termination harmed Plaintiff's employment prospects, "because she was left without an income and seeking a job during the fourth quarter," a time in which "senior executive positions are typically unavailable or extremely difficult to find." (*Id.* ¶ 90.)

B.     *Procedural History*

On September 9, 2021, Plaintiff filed a Complaint in Superior Court of New Jersey, Mercer County, alleging: (1) breach of implied covenant for employment based on additional consideration (Count I) (Compl. ¶¶ 81–89, ECF No. 1-1); (2) unjust enrichment (Count II) (*id.* ¶¶ 90–100); (3) fraudulent inducement (Count III) (*id.* ¶¶ 101–112); (4) promissory estoppel (Count IV) (*id.* ¶¶ 113–120); and (5) violation of the New Jersey Wage Payment Law (Count V) (*id.* ¶¶ 121–127). On October 18, 2021, Berkley removed this matter to this Court. (Not. of Removal 3, ECF No. 1.) On October 25, 2021, Berkley filed a Motion to Dismiss. (ECF No. 6.) On November 15, 2021, Plaintiff filed the Amended Complaint, alleging the same counts and adding an

additional count under the New Jersey Wage Collection Law (Count VI).  (Am. Compl. ¶¶ 145–154.)

On November 23, 2021, Berkley filed a Motion to Dismiss in response to Plaintiff's Amended Complaint.  (ECF No. 9.)  On December 20, 2021, Plaintiff filed an Opposition, (ECF No. 11), and on January 11, 2022, Berkley filed a Reply (ECF No. 14).  Berkley's Motion to Dismiss the Amended Complaint is presently before the Court.

## II.   **LEGAL STANDARD**

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  When considering a Rule 12(b)(6) motion, a district court conducts a three-part analysis.  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 675).  "Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "Third, 'whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement [to] relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  A complaint that does not demonstrate more than a "mere possibility of misconduct" must be dismissed.  *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

III.   **DISCUSSION**

A.   *Matters Outside the Pleadings*

As a threshold inquiry, the Court must determine whether it may consider the employment application, offer letter, and employee handbook (the "attached documents") that Berkley provided in its Motion to Dismiss.  The employment application notes that Plaintiff is an "at-will employee" and that this at-will employee relationship "supersedes" any prior agreement between Plaintiff and Berkley.  (Appl. 3; Def.'s Br. 8.)   The offer letter states that the offer "should not be construed as, and is not a guarantee of[,] employment for any specific duration" and that employees of Berkley are "at-will employees."  (Offer Letter 2–3.)  The employee handbook also notes that employees are at-will and states, "[w]hen employment terminates, the employee will not be paid for any accrued, unused vacation time, except where mandated by state law."  (Employee Handbook 19.) Berkley asserts that the attached documents pertain to the breach of implied contract claim because Plaintiff's acknowledgement of her "at-will" status shows that Berkley did not breach any implied contractual term that Plaintiff would remain at Berkley for six years.  (Reply 4–5, ECF No. 14.) Berkley also argues that the attached documents pertain to her promissory estoppel and unjust enrichment claims because they show that Plaintiff "expressly acknowledged" her at-will status and that her employment was not for any duration.  (*Id.* 6–7.)  The employee handbook also pertains to Berkley's argument that Plaintiff is not entitled to her accrued leave time.  (*Id.* 3.)

Although a district court generally must confine its review to the pleadings on a Rule 12(b)(6) motion, *see* Fed. R. Civ. P. 12(d), "a court may consider certain narrowly defined types of material" beyond the pleadings, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999).  The court may "consider documents that are attached to or submitted with the complaint, . . . matters incorporated by reference or integral to the claim, items subject to judicial

8

notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted). The court may also consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Rockefeller*, 184 F.3d at 287; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (noting that a court may rely on "document[s] . . . *integral to or explicitly relied* upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment") (emphasis in original).

Here, Plaintiff did not include or explicitly reference the attached documents in the Amended Complaint. (*See generally* Am. Compl.) Accordingly, the Court must determine whether the attached documents are "based on," "integral to" or "explicitly relied upon" in the complaint." *In re Rockefeller*, 184 F.3d at 287; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

Berkley argues that the attached documents "set forth the terms of Plaintiff's employment, and are integral to — and dispositive of — her claims regarding the terms of her employment." (Reply 3.) Berkley asserts that "[t]he law is clear that signed documents acknowledging the terms of employment, attached by defendants on a motion to dismiss though not referred to by plaintiffs in their complaints, are properly considered by courts on motions to dismiss." (*Id.* 2 (citing *Hahn v. OnBoard LLC*, 2009 WL 450850, at *4 (D.N.J. Nov. 16, 2009).)

In *Hahn*, the plaintiff brought a lawsuit alleging that the defendants had breached the parties' employment agreement, violated the implied covenant of good faith and fair dealing, and tortiously interfered with the employment agreement. 2009 WL 4508580, at *1. The plaintiff in *Hahn* alleged that, per the employment agreement, his employer owed him certain "termination

payments" and "exit event" payments. *Id.* at *5. To support his argument, the plaintiff cited to particular paragraphs of the employment agreement. *Id.* To determine whether the plaintiff stated a claim for breach of the employment agreement, the court had to refer to the paragraphs cited and thus, deemed the employment agreement "incorporated" by reference into the complaint. *Id.* at *1.

Similarly, in *Angstadt v. Midd-West School District*, the Third Circuit determined that, where the plaintiffs brought a suit challenging a set of requirements at a school district but did not "enumerate the requirements generally nor specify the requirements to which they object," the district court appropriately considered two letters submitted by the school district summarizing those requirements. 377 F.3d 338, 342–43 (3d Cir. 2004). The Third Circuit found that, where the plaintiffs challenged the requirements themselves, "[t]hese requirements were integral to the complaint, as the [plaintiffs'] claim could not be evaluated without some reference to them." *Id.* Thus, "in light of the [plaintiffs'] failure to enumerate them for the District Court, the [defendant] sensibly undertook to do so." *Id.*; *see also In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) (noting that, where plaintiffs to a securities action challenged a prospectus as containing "affirmative material misrepresentations," the court could consider the prospectus, despite the plaintiffs not attaching it to the complaint).

Plaintiff argues that "the documents attached by Berkley are inappropriate for this Court to consider on a motion to dismiss. (Opp'n 11, ECF No. 11-2 (citing *D'Aiuto v. City of Jersey City*, 2007 WL 2306791, at *3–4 (D.N.J. Aug. 8, 2007).) Plaintiff relies on *D'Aiuto* to argue that the attached documents amount to Berkley's submission of "evidence" and that this Court should find that "such evidence [falls] outside the scope of the complaint" and decline to consider it at the motion to dismiss stage. (*See id.* (citing *D'Aiuto*, 2007 WL 2306791, at *4).)

In *D'Aiuto*, the court considered whether a plaintiff's status as an "at-will employee" defeated his promissory estoppel claim "that he was given a 'clear and definite' promise of employment." 2007 WL 2306791, at *3. The defendant attached to its motion to dismiss the plaintiff's "application for employment" and a "release signed by [the] [p]laintiff" to support this argument. *Id.* at *4. The defendant argued that "because [the] [p]laintiff was aware that his employment was at-will, any alleged detrimental reliance by the [p]laintiff on [the defendant's] offer of employment or the commencement of that employment, was unreasonable as a matter of law." *Id.* The district court declined to review the attached documents, noting that the defendant's "arguments are based, in their entirety, on evidence it has submitted with its motion, which falls outside the scope of the Complaint," and that it could not "consider such evidence in deciding whether [the] [p]laintiff ha[d] adequately pled a claim for relief on a promissory estoppel theory." *Id.*

Berkley argues that "Plaintiff's reliance on *D'Aiuto* . . . is misplaced because there[, the] plaintiff conceded that his breach of contract claims could not go forward and the court rule[d] only on whether the documents primarily concerned with an investigation of plaintiff were properly considered on the motion to dismiss plaintiff's promissory estoppel claim." (*See* Reply 3 n.1.) In *D'Aiuto*, the court decided whether it could consider attached documents, a release and employment application indicating the plaintiff's at-will status, to determine whether the plaintiff stated a claim for promissory estoppel. 2007 WL 2306791, at *4. The court did not base its decision, declining to review the documents, on the type of claim that was at issue (*e.g.*, promissory estoppel or otherwise), but rather, on whether it could consider the attached documents when determining whether the plaintiff stated a plausible cause of action. *Id.* at *3–4. The court's reasoning in *D'Aiuto* supports Plaintiff's argument that documents attached to a motion to dismiss

11

to defeat a claim are "evidence" and improper for a district court's consideration on a 12(b)(6) motion. *See id.*

Additionally, in *In re Processed Egg Products Antitrust Litigation*, a defendant attached an entire article, which contained excerpts to which the plaintiff cited in the complaint, to demonstrate that that defendant was not a part of an alleged conspiracy. 821 F. Supp. 2d 709, 740 (E.D. Pa. 2011). The court refused to consider the full article, noting that, "[i]n circumstances when courts do look beyond a pleading to entire documents that are merely cited in the complaint through isolated statements excerpted from such documents, only those documents that are central to the claim at issue, such as contracts for breach of contract claims or public offering documents containing alleged fraudulent statements in securities misrepresentation suits, are appropriate for that purpose." *Id.* (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426). The court determined that it would not consider the article in deciding the motion to dismiss, because it sought to provide "an alternative legitimate explanation for its alleged conduct" or "interject[] factual assertions external to the [complaint]." *Id.* at 740–41. In declining to review the documents at the motion to dismiss stage, the court noted, "such materials [] may well win the day eventually for [the defendant] or others." *Id.* at 741.

Here, the Court finds this matter more closely related to *D'Aiuto* and *In re Processed Eggs Litigation* in that Plaintiff's claims are not *based upon* these documents but rather, provide additional, relevant "evidence" for Berkley to assert after notice to Plaintiff and the opportunity to conduct discovery. *D'Aiuto*, 2007 WL 2306791, at *4; *In re Processed Egg Products Antitrust Litigation*, 821 F. Supp. 2d at 740–41. Plaintiff alleges violations of an oral agreement as opposed to violations of a particular express agreement like in *Hahn*, 2009 WL 4508580, at *1; *Angstadt*, where the complaint challenged particular requirements, 377 F.3d at 343; and *In re Trump Casino*

*Securities Litigation-Taj Mahal Litigation*, where the complaint challenged statements in a prospectus, 7 F.3d at 368. (*See* Am. Compl. ¶¶ 22–35.) Moreover, as in *D'Aiuto* and *In re Processed Eggs Litigation*, where the court determined that the attached documents sought to inject factual assertions or provide an alternative explanation for the defendant's conduct, Berkley seeks to use these documents to explain why Berkley could terminate Plaintiff before six years; why Plaintiff did not reasonably rely on the alleged promises; why Berkley was not unjustly enriched; and why Plaintiff was not entitled to her accrued leave time. *See D'Aiuto*, 2007 WL 2306791, at *3; *In re Processed Eggs Litig.*, 821 F. Supp. 2d at 740–41. As the court noted in *In re Processed Eggs Litigation*, these documents are relevant for a summary judgment motion and go to Berkley's defenses in this case. *See* 821 F. Supp. 2d at 740–41. The Court cannot dismiss Plaintiff's claims based on Berkley's attachments alone without notice to Plaintiff and without allowing Plaintiff the opportunity to conduct any discovery.

Additionally, Berkley cites to other cases where employees acknowledged their "at-will" employment status to argue that the employment application and offer letter "expressly refute the notion that the parties entered into an oral agreement." (Def.'s Br. 14 (citing *Russomanno v. Sunovion Pharms.*, 2020 WL 2520761, at *8 (D.N.J. May 18, 2020) and *May v. Borough of Pine Hill*, 755 F. Supp. 2d 623, 629 (D.N.J. 2010); Reply 5 (citing *Blanos v. Penn Mut. Life Ins. Co.*, 2010 WL 143670, at *2–6 (D.N.J. Jan. 12, 2010).) In *Russomanno*, the plaintiff brought a claim for wrongful termination in violation of an implied agreement. 2020 WL 2520761, at *5–6. Unlike here, the plaintiff in *Russomanno* attached exhibits indicating that she acknowledged her at-will status — an offer letter and a "binding NDA" containing a section called "No Employment Contract." *Id.* at *7. The court did not need to engage in an analysis to determine whether the attached documents were "integral to" or "explicitly relied upon" in the complaint because the

plaintiff herself attached them. *Id.* at *1 n.1 (noting that the plaintiff "attache[d] voluminous exhibits to the Complaint, including various signed agreements, that this Court can consider on a Motion to [D]ismiss").

In *May*, the court reviewed an "employee handbook," which contained a "disclaimer" that the employee was "at-will." 755 F. Supp. 2d at 628. There, the plaintiff alleged "that there was an oral employment contract between herself and [the employer] which was memorialized through her employee handbook and New Jersey statute." *Id.* (citing to the plaintiff's complaint). To evaluate the plaintiff's claim, the court had to determine whether the employee handbook "memorialized" the oral agreement as alleged by the plaintiff. *See id.* (reviewing the employee handbook to determine whether it "memorialize[d] a contract between employer and employee" and whether it contained "effective disclaimer[s]" of the alleged agreement). Thus, when determining whether the employee handbook memorialized the alleged oral agreement as alleged by the plaintiff, the court noted that it "may look to the employee handbook because a document integral to or explicitly relied upon in the complaint may be considered without converting a motion to dismiss into a motion for summary judgment." *Id.* at 628 n.1 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (3d Cir.1997).

Additionally, in *Blanos*, the plaintiff attached to the complaint a letter "in support of his claims." 2010 WL 143670, at *1. The letter outlined his compensation and benefits at the company, which incorporated the employment contract. *Id.* The court reviewed both the letter and the employment contract when determining the plaintiff's claims. *See id.* at *5–8. The court did not engage in an analysis as to whether it could consider documents attached to the motion to dismiss by the defendant because the plaintiff included the operative documents in the complaint. *See id.*

*Russomanno*, *May*, and *Blanos* are distinguishable from the matter before this Court.  In both *Russomanno* and *Blanos*, the plaintiff attached the document at issue to the complaint. *Russomanno*, 2020 WL 2520761, at *1; *Blanos*, 2010 WL 143670, at *1.  In *May*, the plaintiff herself alleged that the employee handbook "memorialized" an alleged oral agreement and thus, the court needed to review the handbook to consider the claim.  755 F. Supp. 2d at 628.  Here, however, Plaintiff has not attached the offer letter, employment application, or employee handbook (or, as in *Blanos*, another document that incorporates them, 2010 WL 143670, at *1).  Nor, as in *May*, does Plaintiff allege that the oral agreement was memorialized in the attached documents. *See* 755 F. Supp. 2d at 628.  To the contrary, Plaintiff does not mention, refer, or rely on Berkley's attached documents in any way.  Thus, these cases do not support Berkley's argument that the Court should review the attached documents at this stage.

Additionally, the Third Circuit has noted the rationale behind the rule preventing the district court's consideration of matters attached to a motion to dismiss: "The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  However, "[w]hen a complaint relies on a document, [] the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Id.* at 1196–97 (finding that, when a complaint sought to recover money pursuant to a purchase and sale agreement and described the agreement and some of its terms, but did not attach the agreement, the complaint was "based on" this agreement and the court could consider the agreement on a motion to dismiss).

The Third Circuit has also noted that the rationale behind the exceptions to this general rule is that it prevents plaintiffs from making allegations of fraud "by extracting isolated statement[s]

and placing [them] in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Thus, "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*; *see also Pension Ben. Guar. Corp.*, 998 F.2d at 1196. In *In re Burlington Coat Factory Securities Litigation*, the plaintiff included in the complaint excerpts of the reports to show that certain information should have been disclosed but did not include the entire reports. 114 F.3d at 1426–27. The Third Circuit found that the district court did not err when considering full earnings reports disclosed by the defendant in its "materiality" analysis in securities fraud claim. *Id.* The Third Circuit determined that the plaintiff's reference to excerpts of the reports was an "unambiguous reference to full-year cost data for 1994" and it could consider the full reports when determining whether the complaint alleged "false or misleading statements or omissions of material fact" that affected trading. *Id.* at 1426.

The issue is whether the Court, for purposes of a motion to dismiss, should consider the documents submitted by Berkely to determine whether Plaintiff's claims are plausible. Here, the rationale underlying this rule and its exceptions are served by declining to consider the attached documents submitted by Berkley. As the Court noted earlier, the attached documents are closer to "additional evidence," for purposes of Berkley's defenses to Plaintiff's claims, as opposed to being "based on" or "integral to" the Amended Complaint. As such, they are "extraneous evidence submitted by the defense" to which the Court must "afford the plaintiff an opportunity to respond." *Pension Ben. Guar. Corp.*, 998 F.2d at 1196.

Further, this does not appear to be a claim based solely on fraud, where Plaintiff has "extract[ed] isolated statement[s] and plac[ed] [them] in the complaint, even though if the

statement were examined in the full context of [a] document, it would be clear that the statement was not fraudulent." *See id.* Nor does it appear to be a case where the plaintiff alleges a violation under a particular agreement, citing to that particular agreement in the complaint. *See id.* Rather, the attached documents are introduced by Defendant, Berkley, in defense of Plaintiff's claims.

The Court cannot as a matter of law conclude that Plaintiff's claims are not plausible based on the attached documents without providing Plaintiff any opportunity to conduct discovery related to the documents. *Compare In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d at 740 (declining to consider documents attached to the motion to dismiss and noting, among other things, that "it [was] unclear whether their authenticity [was] unchallenged"), *with Angstadt*, 377 F.3d at 342–43 (allowing consideration of document and noting, among other things, that the plaintiffs did not dispute the accuracy of the letters, as they were integral to the plaintiff's claims). It is unclear whether Plaintiff in this case disputes the authenticity or accuracy of the attached documents. When reading the Amended Complaint in the light most favorable to Plaintiff and accepting all factual allegations as true, the Court does not find that the attached documents are "based on," "integral to" or "explicitly relied upon" in forming the allegations contained in the Amended Complaint. Therefore, it would be improper for the Court to consider them for purposes of this motion to dismiss.

B.      *Plaintiff's Claims*[3]

1.      Count I — Breach of Implied Contract for Employment

Plaintiff alleges that, based on her discussion with Urban and Wadlund, the parties formed

an implied contract, in which each understood that Plaintiff would be employed for six (6) years,

that she would be promoted to Global Field Officer (GFO), and that Plaintiff would not have to

commute to Ewing, New Jersey. (Am. Compl. ¶¶ 93–98; Opp'n 6.)

Berkley argues that there is no implied contract because Plaintiff signed and acknowledged

that she was an at-will employee in the attached documents. Thus, Berkley argues, it did not

guarantee employment for a certain number of years, and Plaintiff was not entitled to the promotion

to Global Field Officer. (Def.'s Br. 3.) Berkley further asserts that these documents "do not

suggest in any way" that Plaintiff would not have to commute to New Jersey. (*Id.*)

"To state a claim for breach of contract, [a plaintiff] must allege (1) a contract between the

parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating

the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188,

203 (3rd Cir. 2007).

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the

performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert

Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (quoting *Borough of W. Caldwell v. Borough of

Caldwell*, 26 N.J. 9, 24–25 (1958)). To create an enforceable contract, the "parties [must] agree

---

[3] For the purpose of deciding this Motion to Dismiss, the Court applies New Jersey law. Both
parties cite to cases applying New Jersey law when raising arguments about the common law
claims. The parties do not raise choice of law as an issue in their briefs. Berkley noted that choice-
of-law "may need to be addressed in this case" and reserved its right to raise these issues in its
reply. (Def.'s Br. 13 n.5.) However, Berkley did not raise the issue further with respect to this
motion and noted that "there does not appear to be any relevant conflict in laws." (*Id.*)

on essential terms and manifest an intention to be bound by those terms." *Id.* "An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact." *Id.* at 436. To create a contract by conduct, New Jersey courts have determined that, where a party gives no indication that he "objects to the offer's essential terms" and he "accepts the benefit of the offeror's performance," he has "impliedly manifested [his] unconditional assent to the terms of the offer." *Id.* at 436–37 (finding that the "offeree's silence and actions, which induced offeror's detrimental reliance[,]" was acceptance) (citing *Iacono v. Toll Bros.*, 225 N.J. Super. 87, 91–92 (App. Div. 1988)).

First, the Court addresses Plaintiff's breach of implied contract claim as to the alleged terms that Berkley would promote Plaintiff to Global Field Officer and not require her to commute to Ewing, New Jersey. (*See* Am. Compl. ¶¶ 94–95.) The Court finds that Plaintiff sufficiently pled the creation of an implied contract based on the conversation during lunch on or around February 2015 between Plaintiff, Wadlund, and Urban. (*See id.* ¶¶ 22–23.) When discussing the possibility of Plaintiff joining Berkley as Eastern Territory Manager, Plaintiff expressed concerns regarding the commute to New Jersey and the fact that her move to Berkley from ACE was a "lateral move." (*Id.* ¶¶ 23–24.) Based on the allegations in the Amended Complaint, Urban did not object, but rather responded with assurances that Berkley would accommodate Plaintiff's concerns. (*Id.* ¶¶ 27, 31, 32.) According to the Amended Complaint, the "terms" were specific and definite: Urban and Wadlund told Plaintiff that she would not have to commute to Ewing because of Berkley's plans to expand its Philadelphia business in the near future and that, in 3–5 years, the Global Field Officer position would open up for Plaintiff. (*Id.* ¶¶ 27–33.) Accordingly, based on Plaintiff's allegations, Plaintiff left that lunch meeting with an understanding that she would be promoted to a position with increased compensation and responsibility, that she would be

promoted into the Global Field Officer role, and that her commute to Ewing would be temporary. (*Id.* ¶¶ 29–30.)  Further, Plaintiff alleges that the parties began performing the contract:  Plaintiff began work as Eastern Territory Manager and, after some time, Berkley lessened Plaintiff's commute to New Jersey and gave her increased responsibility.  (*Id.* ¶¶ 48–52.)  Based on the allegations that the parties discussed these terms at the lunch meeting on or around February 2015, and then began performing them in the years following, the Court finds that Plaintiff has plausibly alleged that Berkley did not object to Plaintiff's essential terms and then, began to "accept the benefits of [Plaintiff's] performance" when she began as Eastern Territory Manager.  *See Weichert Co.*, 128 N.J. at 436–37.  Thus, the Court finds that Plaintiff has plausibly alleged the existence of an implied contract as to the terms regarding the Global Field Officer position and the commute to Ewing.

Second, the Court considers the alleged term that Berkley orally agreed to keep Plaintiff employed for six years.  (Am. Compl. ¶¶ 92–93.)  New Jersey presumes at-will employment relationships, which means that employers may "terminate the employment of at-will employees for cause or for no cause at all, in the absence of an employment contract providing otherwise." *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 285 (1988).  Courts have determined that a "verbal promise or representation to an individual employee" may serve as grounds to override at-will employment and create a for-cause employment contract or an employment contract for a duration of time.  *See Russomanno*, 2020 WL 2520761, at *6 (citing *Shebar*, 111 N.J. 276).  When determining whether an oral agreement has created a for-cause or durational employment contract, courts must ascertain the "intent of the parties . . . from the language employed, from all attending circumstances, and from the presence or absence of the giving by the employee of consideration additional to the services incident to his employment." *Shiddell v. Electro Rust-Proofing Corp.*,

34 N.J. Super. 278, 289 (App. Div. 1954); *see, e.g.*, *Savarese v. Pyrene Mfg. Co.*, 9 N.J. 595, 603 (1952) (when considering attending circumstances of the alleged oral agreement, finding no agreement for lifetime employment when employer assured the employee that he "will have the foreman's job for the rest of [his] life" in the context of a company softball game).

For example, in *Shebar*, when an employee alleged a verbal employment contract for a specific duration that "turn[ed] on the unique, oral promise [that the] defendant made *specifically to him*, in a private conference," this "individualized contract" "constitute[d] an enforceable obligation on the part of the defendant to terminate [the] plaintiff's employment only for reasonable cause." 111 N.J. at 284, 288–89 (emphasis in original). There, the plaintiff alleged that his employer's president called the plaintiff to his office after the plaintiff attempted to resign, told the plaintiff that he (the president) was "personally insulted by [the plaintiff's] resignation, that [the plaintiff's] performance was exceptionally good, that [the] plaintiff should have brought any problems or dissatisfaction to his [the president's] attention, and that the company did not want [the plaintiff] to resign . . ." *Id.* at 282. The plaintiff further alleged that the president told the plaintiff "that he [the plaintiff] had a job for the rest of his life . . ." *Id.* Thereafter, the plaintiff revoked his acceptance of another offer, continued working for his employer, and was terminated four months later. *Id.* at 283. The court determined that the plaintiff alleged a breach of an oral contract that "he would have a job for life or at least he could not be fired without cause[,]" based on the "unique, oral promise" that the president of his company made to him; in doing so, the court rejected the defendant's argument that the oral promises of lifetime employment were "unenforceable 'friendly assurances.'" *Id.* at 284.

Additionally, to demonstrate the existence of an oral employment contract, the employee must "provide sufficient consideration 'separate and apart' from the willingness to work." *Martin*

*v. Port Auth. Transit Corp.*, 2010 WL 1257730, at *5 (D.N.J. Mar. 25, 2010) (quoting *Obendorfer v. Gitano Grp., Inc.*, 838 F. Supp. 950, 953 (D.N.J. 1993)). "A forbearance, such as forgoing the opportunity to pursue other employment, is insufficient as a matter of law to constitute valid consideration in the context of an oral employment agreement." *May*, 755 F. Supp. 2d at 629; *see also Martin*, 2010 WL 1257730, at *5 (finding that, when an employer told an employee that she would hold the employee's job offer open, and the employee forewent "the opportunity to pursue other employment," this was insufficient consideration to create an oral employment contract for anything other than an at-will employment relationship); *Obendorfer*, 838 F. Supp. at 953 (finding no oral employment contract when the plaintiff failed to establish the "existence of consideration additional to the services incident to his employment").

However, an employee's foregoing of an existing job provides adequate consideration "separate and apart" from the employee's willingness to work. *Martin*, 2010 WL 1257730, at *5. For example, in *Shebar*, the court determined that, where the employee decided to "relinquish his new position at [another employer] in exchange for job security at [his current employer]" and his current employer, "in turn, agreed to relinquish its right to terminate plaintiff's employment at will in exchange for the retention of a valued employee" amounted to a "bargained-for and exchanged promise[] [that] furnish[ed] ample consideration for an enforceable contract." 111 N.J. at 288–89.

Additionally, oral employment contracts for a specific duration of time must have "sufficiently precise contract terms." *Obendorfer*, 838 F. Supp. at 953; *see also Savarese*, 9 N.J. at 603 ("The responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself.")

Here, based on the alleged "attending circumstances" of the initial employment relationship, the Court finds that the Amended Complaint has plausibly alleged that Berkley and Plaintiff intended to override the presumption of at-will employment for a term of employment of six years. First, Plaintiff alleges that she left the meeting with an understanding that she would work at Berkley for six years. (Am. Compl. ¶ 29.) Berkley's assurances of future growth opportunities, the Global Field Officer role, and the expansion to the Philadelphia office further support that the parties foresaw that employment relationship lasting for at least some duration of time. (*Id.* ¶¶ 26–33). Second, Urban specifically sought out Plaintiff to discuss the employment opportunity, (*id.* ¶¶ 21–22) and made "unique" representations "*specifically to [her]*, in a private conference," *i.e.*, the lunch meeting. *Shebar*, 111 N.J. at 284. The fact that Urban and Wadlund met with Plaintiff specifically to discuss the terms of her employment suggests that they intended to form an "individualized contract" with Plaintiff that overrides at-will employment. *See Shebar*, 111 N.J. at 284, 288–89. Finally, Plaintiff alleges consideration for the oral agreement that is "separate and apart" from her willingness to work for Berkley — specifically, like the plaintiff in *Shebar*, she forwent an existing job, her job at ACE, where she received higher bonuses and had unvested stock options and awards. *See Martin*, 2010 WL 1257730, at *5; *Shebar*, 111 N.J. at 288–89; (Am. Compl. ¶¶ 25, 27.) In turn, Berkley told her that it would accommodate her concerns about the move to Berkley being a "lateral move" by giving her the opportunity for a promotion to Global Field Officer and accommodating her concerns about commuting to Ewing. (Am. Compl. ¶¶ 23–31.) The Court finds that this exchange suffices as consideration "separate and apart" from Plaintiff's willingness to work.

Berkley cites *Russomanno v. Sunovion Pharmaceuticals* and *May v. Borough of Pine Hill* for the assertion that the offer letter and job application, both signed by Plaintiff, "expressly refute

the notion that the parties entered into an oral agreement." (Def.'s Br. 14.)  While the attached documents may ultimately "win the day" for Berkley, *see In re Processed Egg Products Antitrust Litigation*, 821 F. Supp. 2d at 741, for the purposes of deciding this Motion to Dismiss, the Court must look to the allegations in the Amended Complaint to determine whether Plaintiff has asserted a plausible claim. Plaintiff in this case, unlike the plaintiffs in *Russomanno* and *May*, asserts additional, specific facts, based on the pre-employment discussions, that overcome the presumption of at-will employment and that support the allegation that the parties did not intend an at-will employment relationship. (Am. Compl. ¶¶ 20–29); *see also Russomanno*, 2020 WL 2520761, at *7 (dismissing the plaintiff's implied contract claim because "Plaintiff has not pled that an implied agreement existed that would have altered her at-will status at Sunovion"); *May*, 755 F. Supp. 2d at 629 (rejecting plaintiff's implied contract because she "has not alleged adequate facts from which this Court may infer there was a contract").  Accordingly, based on the allegations in the Amended Complaint, the Court finds that there are sufficient facts to support a plausible claim that Plaintiff and Berkley intended a relationship other than an at-will employment relationship and that Plaintiff has plausibly alleged that the parties agreed to a six-year term of employment.

### 2.   Count II — Unjust Enrichment

"To establish a claim for unjust enrichment under New Jersey law, a plaintiff must allege 'both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)).  Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. *Id.* (citing to *Nat'l Amusements, Inc. v. N.J. Tpk. Auth.*, 261 N.J. Super. 468, 478 (Law Div.1992),

*aff'd*, 275 N.J. Super. 134, 645 A.2d 1194 (App. Div. 1994)).

Plaintiff alleges that she provided "expert services, labor and hard work with the expectation of being paid her rightful and promised compensation, including, but not limited to, at least six (6) years of employment, promotion to the Global Field Officer role along with its accompanying salary and benefits, and the maximum allowable benefits." (Am. Compl. ¶ 105.) She further alleges that Berkley was unjustly enriched because it used her "hard work and arduous efforts" to "further its business activities and earn substantial profits." (*Id.* ¶¶ 106, 108.) She alleges that she "was refused severance commensurate with her contributions to [Berkley], particularly in light of the severance packages awarded to other Berkley employees who had not made [the same] contributions" as Plaintiff; that she worked nine months in 2019 yet did not receive her bonus; and that she accrued significant leave time for which she was not compensated." (*Id.* ¶¶ 111–113.)

Berkley argues that Plaintiff received benefits of her work through her "expanded role as a territory manager and a promotion to the President's 'executive team,' bonuses and salary increases[,] and an almost-ideal commuting schedule for over three years of her nearly four and a half years." (Def.'s Br. 19 (citing Am. Compl. ¶¶ 48–49, 51–52, 56–62, 69–70).) Berkley further argues that Plaintiff does not allege that she is entitled to any maximum severance and thus, her unjust enrichment claim for severance also fails. (*Id.*)

Plaintiff's work as the Eastern Territory Manager itself is not "unjust enrichment" because Berkley compensated her and gave her bonuses and salary increases for her work. (Am. Compl. ¶¶ 35, 51.) However, to the extent that Plaintiff's "hard work and arduous efforts" furthered Berkley's business, Plaintiff has stated a plausible claim for compensation beyond what she earned as Eastern Territory Manager because she alleges that she conferred the benefit of her "expert and

valuable services" with the expectation that she would be compensated for those services with "at least six (6) years of employment, promotion to the Global Field Officer role along with its accompanying salary and benefits, and the maximum allowable severance benefits." (Am. Compl. ¶¶ 52, 105, 106, 108, 111–113.)  Plaintiff also alleges that she provided a benefit beyond her role as Eastern Territory Manager, *e.g.*, by "handling both the eastern and western territories" when her counterpart on the west coast resigned," and by being "a member of the six-person executive team" that Urban created when she became President of the company. (*Id.* ¶¶ 52, 62.)  She further asserts that Berkley "refused to pay her for the full extent of the services including by failing [sic] to reward her with the promised promotion into the Global Field Officer role" and the benefits that came with it. (*Id.* ¶¶ 105, 109.)

Accordingly, this case is unlike the cases cited by Berkley, where the plaintiffs alleged unjust enrichment in a "conclusory fashion" because here, Plaintiff sets forth facts to demonstrate that she conferred a benefit on Berkley beyond her role as Eastern Territory Manager for which she went uncompensated.  (Def.'s Br. 20 (citing *Rickerson v. Pinnacle Foods Inc.*, 2017 WL 6034147, at *6 (D.N.J. Dec. 6, 2017 (dismissing unjust enrichment claim as conclusory when it alleged that "Defendants' conduct described above has caused Defendants to become unjustly enriched"); *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 312 (D.N.J. 2013) (dismissing unjust enrichment claim where the plaintiff "formulaically recite[d] the[] elements [of unjust enrichment]" but failed to allege that the defendants received a benefit for which the plaintiff was uncompensated); *Rodridguez v. Ready Pac Produce*, 2014 WL 1875261, at *3 (D.N.J. May 9, 2014) (dismissing unjust enrichment claim where "nothing in the [c]omplaint suggest[ed] that Plaintiff had any reason to expect additional compensation for time spent at work beyond his usual hours").))

The Court also finds that Plaintiff states a claim for unjust enrichment for the expected bonus and accrued days off from the nine months out of her final year at Berkley. On these issues, Plaintiff alleges that she conferred the benefit of her work as Eastern Territory Manager, with an expectation of compensation of these accrued days and annual bonus. Thus, as alleged, Berkley "received a benefit" of her working her last nine months but did not fully compensate her by giving her the bonus and accrued days off. *See Adamson*, 463 F. Supp. 2d at 505. Although Plaintiff does not allege facts to support that the "accrued days off" or "bonus" were part of the implied contract between the parties in Count One, the Court finds that Plaintiff has sufficiently alleged facts to support a claim regarding "accrued days off" and the "bonus" on an equitable basis. The Court finds that Plaintiff's unjust enrichment claim may move forward as to her bonus and accrued days off during her final year of employment at Berkley.

### 3.   Count III — Fraudulent Inducement

Plaintiff alleges that, during her recruitment process, Berkley employees made representations "to induce her to abandon her then-current position and accept a position with Berkley." (Am. Compl. ¶ 119.) She alleges that these statements include: (1) that her employment with Berkley would last at least six years; (2) that Berkley would promote her to Global Field Officer; (3) that Berkley would not require her to commute to Ewing; and (4) that Berkley would permit her to split her time between Philadelphia and working from home. (*Id.*) She further contends that the Berkley employees "had no intention of actually honoring [those] promise[s]," and that Plaintiff relied on these "misrepresentations" when deciding to quit her job and start at Berkley. (*Id.* ¶¶ 120–129.)

Berkley argues that Plaintiff has failed to plead the five essential elements of a New Jersey fraud claim with the specificity required by Rule 9(b). (Def.'s Br. at 21–22.)

To state a claim for fraud, the plaintiff must allege that the defendant (1) made a material misrepresentation of a presently existing or past fact, (2) knew or believed the misrepresentation was false, and (3) knowingly made the representation with the intent to induce the plaintiff's reliance; and that the plaintiff (4) reasonably relied on the misrepresentation; and (5) suffered damages as a result. *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015).

The heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to Plaintiff's claim of fraudulent inducement. *See Frederico*, 507 F.3d at 203. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff "must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 85–86 (3d Cir. 2015) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)). The particularity standard ensures that "defendants [are placed] on notice of the precise misconduct with which they are charged, and [are safeguarded] against spurious charges of immoral and fraudulent behavior." *Id.* (citing *Lum*, 361 F.3d at 223–24).

Plaintiff has not alleged these elements with the heightened particularity required by Rule 9(b). First, regarding the alleged misrepresentation that Berkley would employ Plaintiff for six years, Plaintiff alleges that both parties left with an understanding that she would remain at Berkley for six years. (Am. Compl. ¶¶ 93–98.) This allegation does not sufficiently "inject precision or some measure of substantiation" to explain the particular circumstances surrounding the alleged misrepresentation, *e.g.*, what Wadlund or Urban actually said that was false. *See Frederico*, 507 F.3d at 200 (finding that the plaintiff did not state a fraud claim when she alleged that Home Depot committed fraud by misrepresenting the hours during which rental vehicles could be returned to avoid the accumulation of late fees because she alleged only "generic references" and "broad

statements" that failed to disclose "the substance of the representation" that Home Depot actually made with respect to its rental vehicle return policy).

Second, regarding Plainiff's other alleged misrepresentations — that Berkley would promote Plaintiff to Global Field Officer, not require her to commute to Ewing, and allow her to split her time between working from home and from Philadelphia — Plaintiff has not pled that Berkley "knew or believed" the alleged misrepresentations were false and made with the intent to induce the plaintiff's reliance. *See Allstate New Jersey Ins. Co.*, 222 N.J. at 147. Rather, the Amended Complaint alleges that, during the course of Plaintiff's employment, Berkley took actions to uphold these statements, including "secur[ing] space for [Plaintiff] at a sister company's office in Philadelphia" in October 2015 and decreasing her commute to Ewing, (Am. Compl. ¶ 48); increasing Plaintiff's responsibilities to include "handl[ing] both the eastern and western territories, (*id.* ¶ 52); and giving her bonuses and salary increases, (*id.* ¶ 51). Accordingly, Plaintiff has not pled with particularity that Berkley knew or reasonably believed that it would not promote Plaintiff or require Plaintiff to continue commuting to Ewing when recruiting her to work for Berkley. *See Allstate New Jersey Ins. Co.*, 222 N.J. at 147.

Thus, based on the Amended Complaint, Plaintiff's claims regarding misrepresentation fail to meet the elements for fraudulent inducement under the specificity required by Rule 9(b). The Court dismisses Plaintiff's fraudulent inducement claim in its entirety.

### 4.    Count IV — Promissory Estoppel

Plaintiff alleges that Berkley "made a number of promises to [Plaintiff], including, but not limited to, indicating that her employment at Berkley would last at least six (6) years, that [Plaintiff] would be promoted to the Global Field Officer position, that [Plaintiff] would not be required to commute to the Ewing, New Jersey office, and that [Plaintiff] would be permitted to

split her time between Philadelphia and working from home." (Am. Compl. ¶ 131.) Plaintiff further alleges that, based on these promises, Berkley reasonably expected Plaintiff to quit her job at ACE and work at Berkley. (*Id.* ¶ 132.) According to Plaintiff, she "quit her stable, lucrative employment" in reliance on these promises. (*Id.* ¶ 134.)

Berkley argues that Plaintiff's promissory estoppel claim must fail because the alleged promises were not "clear or definite," and because Plaintiff failed to allege that she "reasonably relied" on these promises. (Def.'s Br. 16–18.)

"Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 N.J. 326, 339–40 (2021) (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253 (2008)) (internal quotation marks omitted). "Under New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Freightmaster USA, LLC v. Fedex, Inc.*, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir. 1983) (dismissing promissory estoppel claim because express contract existed)).

"The essential justification for the promissory estoppel doctrine is to avoid the substantial hardship or injustice which would result if such a promise were not enforced. New Jersey courts engage in an equitable analysis designed to avoid injustice." *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 704 A.2d 1321, 1324 (App. Div. 1998). When determining whether a "clear and definite" promise exists, courts "have tended to relax the strict adherence to the *Malaker* formula

for determining whether a prima facie case of promissory estoppel exists" and moved towards a more equitable analysis.[4] *Id.* at 1324–25.

The Court finds Plaintiff's allegations — that Wadlund "promised to expand the Territory Manager role, to groom [Plaintiff] to take over as Global Field Officer and promised [Plaintiff] that she would take over as Global Field Officer;" that Wadlund and Urban "committed to [Plaintiff] that any commuting to Ewing would be only on a temporary basis;" and that both parties "understood that [Plaintiff] was being promised employment of at least six years" — sufficiently allege "clear and definite" promises when viewed in the light most favorable to Plaintiff, and for the purposes of deciding a motion to dismiss.  (Am. Compl. ¶¶ 25–26, 28–29); *see also Pop's Cones, Inc.*, 704 A.2d at 1326 (finding that the plaintiff alleged a "clear and definite promise" when the complaint stated that, when hotel owner "assured" a franchisee that the franchise could lease on its property and "advised" the franchisee not to renew its current lease).

Additionally, Plaintiff plausibly alleges the second element of promissory estoppel — that Berkley reasonably expected Plaintiff to rely on the alleged promises regarding employment at Berkley because, according to the Amended Complaint, Wadlund and Urban made these promises in the context of trying to get Plaintiff to work for them.  (*See* Am. Compl.  21, 26–33.)  Thus, Berkley could have foreseen Plaintiff leaving her job at ACE to work for Berkley based on these promises.  *See Pop's Cones, Inc.*, 307 N.J. Super. at 473 (citing Restatement (Second) of Contracts § 90 cmt. b and finding, in a promissory estoppel action based on the defendant's alleged promise to give the plaintiff space to lease, that the promisor "should reasonably have expected to induce

---

[4] *Malaker* is an earlier New Jersey case, which required a higher showing for "clear and definite promise." *Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank*, 395 A.2d 222, 230–31 (App. Div. 1978).  This strict adherence to "clear and definite promise" has been eroded by later cases. *See Pop's Cones, Inc.*, 704 A.2d at 1326.

action or forbearance on the part of the plaintiff" when he told the plaintiff "not to renew [his former] lease" and to "pack up [] and start moving").

Regarding the third element, reasonable reliance, Berkley argues that "statements regarding future expectations negate both the 'definite promise' and 'reasonable reliance' prongs of the test for promissory estoppel." (Reply 16 (quoting *Del Sontro v. Cendant Corp.*, 223 F. Supp. 2d 563, 576 (D.N.J. 2002).) In *Del Sontro*, the court rejected a promissory estoppel claim where the plaintiff sought to characterize a "proposed Voluntary Settlement," "subject to modification or withdrawal at [the defendant's] sole discretion," as a "clear and definite promise" on which the plaintiff "reasonably relied." 223 F. Supp. at 575. However, unlike the alleged promise in *Del Sontro*, here, Plaintiff alleges details that demonstrate that Berkley's promises were more than just "indefinite proposal[s]" or "mere expression[s] of future intentions." *Id.* at 576 (quoting *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir.1989)). Specifically, Plaintiff alleges that, in response to her concerns with leaving ACE, Wadlund "advised" Plaintiff about her plans to retire, which would leave the Global Field office position "vacant for [Plaintiff] to take over;" that "commuting to Ewing would be temporary;" and that Berkley "would be utilizing other Berkley space in the Philadelphia area," and "intended to place all of the Eastern Territory employees in Philadelphia, separate from the Ewing-based employees." (Am. Compl. ¶¶ 28, 32–33.) These statements are sufficiently definite to induce Plaintiff's reasonable reliance.

Finally, Plaintiff has alleged detriment — namely, that she left her prior job with a higher salary, stock options, and awards — based on Berkley's promises. (*See* Am. Compl. ¶¶ 25, 27.)

Accordingly, Plaintiff's promissory estoppel claim may move forward because Plaintiff has plausibly pled that Wadlund and Urban assured her that Berkey would promote her to Global Field Officer and that she would not have to commute to Ewing, New Jersey. Based on these

representations and the parties' alleged understanding that Plaintiff's employment would last six years, the Court will also allow Berkley's "indicat[ion] that her employment . . . would last at least six [] years" to move forward on the promissory estoppel theory.  (*Id.* ¶ 131.)[5]

### 5.   Count V — New Jersey Wage Payment Law

Plaintiff alleges that Berkley "failed to pay Plaintiff her compensation earned as defined by the [New Jersey Wage Payment Law ("NJWPL")] during the course of her employment within the time limits prescribed by the NJWPL."  (Am. Compl. ¶ 141.)

Berkley makes three arguments in favor of dismissal of Plaintiff's NJWPL claim: (1) that Plaintiff left Berkley one month after the enactment of the NJWPL, and the NJWPL does not apply retroactively; (2) that Plaintiff's expected bonus does not fall under the definition of "wage" in the NJWPL; and (3) that, absent a contract stating otherwise, accrued leave time is not a recoverable "wage" under the NJWPL.  (Def.'s Br. 25–26.)

The New Jersey Wage Payment Law ("NJWPL") sets forth requirements as to an employer's timing and mode of payments to his employee.  N.J.S.A. 34:11-4.2.  It also requires that, "when an employer discharges an employee, . . . the employer shall pay the employee all

---

[5] The Court notes that, should Plaintiff succeed on the breach of implied contract claim (Count I), she may not also recover on her promissory estoppel and unjust enrichment claims (Counts II and IV) involving the same "terms" or "promises" because Plaintiff may not recover on both contractual and quasi-contractual theories.  *See Freightmaster USA, LLC*, 2015 WL 1472665, at *6 (noting that unjust enrichment and promissory estoppel claims are "unavailable since an express contract covers the subject matter of the dispute").  However, the Court allows both the contractual and equitable claims to move forward at this early stage in the litigation.  *See Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc.*, 2006 WL 2788369, at *5 (D.N.J. Sept. 27, 2006) ("While it is true that some of plaintiff's quasi-contractual or other equitable claims may be dismissed as inconsistent at a later time in these proceedings, it is far to [sic] early to do so now."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (noting that "Plaintiffs [] are clearly permitted to plead alternative theories of recovery," and declining to dismiss unjust enrichment claim because "it would be premature at this stage of the proceedings").

wages due not later than the regular payday for the pay period during which the employee's termination [occurred]." N.J.S.A. 34:11-4.3. The NJWPL confers a private cause of action on employees for an employer's failure to pay wages according to its requirements. N.J.S.A. 34:11-4.3; *Kaplan v. Greenpoint Glob.*, 2014 WL 4793024, at *8 (D.N.J. Sept. 25, 2014) (citing *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Super. Ct. Law Div. 1999)).

The NJWPL defines "wages" as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J.S.A 34:11–4.1.c.

When determining whether alleged "wages" are "supplementary incentives and bonuses" excluded under the statute, New Jersey courts look to see whether "the payments in question are incentive based," or are "paid in addition to a base salary" to incentivize the employee. *Sluka v. Landau Uniforms, Inc.*, 383 F. Supp. 2d 649, 656 (D.N.J. 2005) (finding that a two percent commission "designed to motivate and reward a salesperson" falls under "supplementary incentives" and thus, excluded under the NJWPL); *Van Winkle v. STORIS, Inc.*, 2017 WL 837066, at *4 (N.J. Super. Ct. App. Div. Mar. 2, 2017) (finding that commissions above the base salary as a means of incentivizing sales do not fall under NJWPL's definition of "wages").

Here, while Plaintiff argues in her Opposition that "the bonuses to be paid to [her] were to be included as part of her compensation and thus should be deemed as wages under the statute," (Opp'n 20), she does not set forth facts in the Amended Complaint to support this assertion. Rather, the Amended Complaint alleges that, Berkley gave Plaintiff her bonus as a result of her "excellent performance." (Am. Compl. ¶ 51.) The fact that Berkley gave her the bonus for her excellent performance demonstrates that her bonus was a "supplementary incentive," and not part

34

of her "base salary." *See Sluka*, 383 F. Supp. 2d at 656; *Van Winkle*, 2017 WL 837066, at *4. Thus, Plaintiff may not recover her bonus under the NJWPL.

Additionally, Plaintiff alleges that she "had accrued leave time which was not paid to her at the time of her termination or at any time thereafter." (Am. Compl. ¶ 86.) However, the allegation that she "accrued leave time," on its own, does not plausibly state that this leave time is wages under the NJWPL. *See Chrin v. Cambridge Hydrodynamics, Inc.*, 2003 WL 25754809, at *1 (N.J. Super. Ct. App. Div. Dec. 30, 2003) (rejecting plaintiffs arguments that "unused vacation pay constitutes wages, as defined by N.J.S.A. 34:11-4.1c" and concluding that "there is no legal support for plaintiff's position that, in the absence of a signed employment contract or other promise by his employer, compensation for unused vacation time constitutes wages, N.J.S.A. 34:11-4.1c, which must be paid by his employer upon his termination pursuant to N.J.S.A. 34:11-4.3"). Because Plaintiff does not allege facts to show that the parties' oral agreement included "accrued leave time," Plaintiff has not plausibly alleged that the accrued time is "wages" under the NJWPL. (*See* Am. Compl. ¶¶ 92–97, 131–134.)

Accordingly, the Court dismisses Plaintiff's claims under the New Jersey Wage Payment Law on the grounds that Plaintiff has not plausibly pled that her "bonus" or "accrued leave time" constitute "wages" under the NJWPL.

6.   Count VI — New Jersey Wage Collection Law

Plaintiff alleges that Berkley owes her unpaid wages under another provision of the New Jersey wage law, the New Jersey Wage Collection Law ("NJWCL") as amended by the Wage Theft Act ("WTA") in 2019. (Am. Compl. ¶¶ 145–154); *See* N.J.S.A. 34:11-57–67.2. In her opposition, she argues that her unpaid bonus and accrued leave time fall under the broader definition of "wages" under this provision, which includes "commissions, bonus, piecework

compensation and any other benefits arising out of an employment contract." N.J.S.A. 34:11-57;

(Opp'n 21.)

Berkley argues that the NJWCL "refers to a portion of New Jersey's wage laws dealing

with the Commissioner of Labor and Industry," and thus, does not confer a private right of action

for individual litigants. (Def.'s Br. at 27 (quoting *Carita v. Mon Cheri Bridals, LLC*, 2012 WL

2401985, at *11 (D.N.J. June 25, 2012)).

Under the NJWCL, an employee may file a "claim for wages against an employer under

this section or any of the other State wage and hours laws for wages owed related to work

performed, . . . up to six years prior to the date the claim for wages is filed." N.J.S.A. 34:11-58.a.

The statute allows plaintiffs to file wage claims with the "Wage Collection Division" within the

New Jersey Department of Labor and Workforce Development (NJDOL) and allows the NJDOL

to investigate and resolve certain claims made against employers. N.J.S.A. 34:11-58. The statute

also allows an employee to bring a claim in court and have a trial on the issue. *See* N.J.S.A. 34:11-

66 ("Nothing in this article shall prevent the claimant from instituting an action for his claim in

any court of competent jurisdiction or be construed to deny or limit the right of the plaintiff or

defendant to a trial by jury.") After filing a claim, "[a]ny party may appeal the administrative

decision to the Superior Court, which may consider the *de novo* wage dispute." *Stratus Tech.*

*Servs.*, 2015 N.J. Super. Unpub. LEXIS 2653, at *5 (Super. Ct. App. Div. Nov. 18, 2015).

On review of the statute and the case law, the Court cannot find a cause of action under the

NJWCL. Rather, the NJWCL outlines an administrative process through which employees may

recover wages in wage disputes. First, the statute itself does not explicitly state a cause of action.

The portion to which Plaintiff cites falls under Article 3, which is called "Wage Collection

Division." *See* N.J.S.A. 34:11-57–34:11-67.2. It defines upfront that the "Commissioner" means

the "Commissioner of Labor and Workforce Development of any person or persons in the department designated in writing by him for the purposes of this article." N.J.S.A. 34:11-57. It "authorize[s] and empower[s]" the Commissioner, through NJDOL's Wage Collection Division, to "investigate any claim for wages due any employee," including "summon the defendant, subpoena witnesses, administer oaths, take testimony," and award the amount owed. N.J.S.A. 34:11-58. It outlines the "procedure" for an employee to appeal a decision by Wage Collection Division in Superior Court, N.J.S.A. 34:11-63; requires employers to provide employees a "written copy . . . of the employee's rights under the provisions of State wage and hour laws, N.J.S.A. 34:11-58.3; sets forth the process for filing a claim in the Wage Collection Division of the NJDOL, N.J.S.A. 34:11-59; authorizes the Commissioner to "administer oaths, take testimony[,] and take . . . depositions of witnesses," N.J.S.A. 34:11-61; and permits introduction of evidence in trial on appeal, N.J.S.A. 34:11-65.[6]

Second, the Court's review of case law on this matter supports the determination that the NJWCL creates an administrative and procedural framework for employees to file wage claims and does not, itself, create a cause of action. In other cases, employees have brought "wage claims" under the procedure outlined by the NJWCL, but have asserted violations under other wage laws or the court has characterized their claims as violations under other wage laws. *E.g.*, *Branch v. Cream-O-Land Dairy*, 212 A.3d 947, 950 (App. Div. 2019), *aff'd as modified*, 243 A.3d 633 (2021) (bringing claims before the NJDOL for employer's violation of the New Jersey Wage and Hour Law, WHL, N.J.S.A. 34:11-56a–56a38); *Carita*, 2012 WL 2401985, at *11 (bringing claims

---

[6] One sub-section that a court could construe as a "cause of action" is N.J.S.A. 34:11-58.6, which defines when a person "commits the crime of pattern of wage nonpayment." Plaintiff does not allege that Berkley committed such a crime and thus, the Court need not decide whether the NJWCL creates this cause of action.

under the NJWPL, N.J.S.A. 34:11-3); *Vaughan v. Siegel*, 2018 WL 6729719, at *1 (N.J. Super. Ct. App. Div. Dec. 24, 2018) (bringing "wage claim," which the NJDOL characterized as a claim under the NJWPL); *see also Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 725 (2007) (recognizing that employees "may submit their claims to the Wage Collection Division of the Department of Labor pursuant to the Wage and Hour Law").

Further, the Supreme Court of New Jersey has referred to the wage claim process outlined in the NJWCL as an "administrative framework" or an "administrative structure" for "aggrieved employees" to recover wages. *Iliadis*, 922 A.2d at 725–26. In doing so, the Supreme Court of New Jersey noted that an employee's ability to file a claim with the Wage Collection Division was a procedural mechanism to adjudicate a wage dispute. *See id.* at 725–26 (noting the differences between the process of adjudicating a wage claim with the NJDOL and the process of filing the claim in court). At least one other court in this district has reached the same conclusion, finding that the NJWCL is "a portion of New Jersey's wage laws dealing with the Commissioner of Labor and Industry; it does not apply to private lawsuits." *Carita*, 2012 WL 2401985, at *11.

Moreover, Plaintiff cites no case where an employee brings a claim asserting that his employer violated the NJWCL. Plaintiff cites to *B & H Sec., Inc. v. Pinkney* to support her argument that the NJWCL creates its own cause of action. 960 A.2d 421, 423 (App. Div. 2008). This case, however, does not clarify what the "cause of action" is under the NJWCL. Rather, it finds that a court has "plenary control" over a wage claim removed to the court, even if the employee originally filed the claim with the NJDOL. *B & H Sec., Inc.*, 960 A.2d at 424. And, the other case Plaintiff cites, *Mulford v. Computer Leasing, Inc.*, finds a private right of action under a different sub-section of the wage law. *See* 759 A.2d 887, 891 (Law. Div. 1999) (citing NJWPL, N.J.S.A. 34:11-4.1, noting that "statute is intended to allow a private right of action (a civil action)

for a violation thereof to the employee against the employer and its managing officers for wages not paid as provided therein"). While *Mulford* supports an argument that Plaintiff has a cause of action under the NJWPL, 759 A.2d at 891, the Court has already discussed (and dismissed) that count for Plaintiff. *See supra* III.B.5.

The Court need not decide whether the bonus or accrued leave time fall under the definition of "wages" under this article of the statute because the Court has determined that the NJWCL does not create a cause of action. Thus, the Court rejects Plaintiff's argument that she may bring a separate claim under the NJWCL and grants Berkley's motion to dismiss as to this claim.

## IV.  **CONCLUSION**

Accordingly, for the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Berkley's Motion to Dismiss the Amended Complaint.  (ECF No. 9.)

The Court grants the Motion as to the fraudulent inducement (Count III) and New Jersey Wage Payment Law (Count V) claims.  These claims are dismissed without prejudice.  The Court grants Plaintiff thirty days to amend to cure the deficiencies stated in this Opinion.

The Court grants the Motion as to Plaintiff's New Jersey Wage Collection Law claim (Count VI).  This claim is dismissed with prejudice.

The Court denies the Motion as to the implied contract (Count I), unjust enrichment (Count II) and promissory estoppel (Count IV) claims.

An appropriate Order will follow.


Date: July 7, 2022

GEORGETTE CASTNER, U.S.D.J.